(Slip Opinion)          OCTOBER TERM, 2004          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SPECTOR ET AL. *v.* NORWEGIAN CRUISE LINE LTD.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 03–1388.   Argued February 28, 2005—Decided June 6, 2005

Respondent NCL is a cruise line operating foreign-flag ships departing from, and returning to, United States ports. The petitioners, disabled individuals and their companions who purchased tickets for round-trip NCL cruises from Houston, sued NCL under Title III of the Americans with Disabilities Act of 1990 (ADA), 42 U. S. C. §12181 *et seq.*, which prohibits discrimination based on disability in places of "public accommodation," §12182(a), and in "specified public transportation services," §12184(a), and requires covered entities to make "reasonable modifications in policies, practices, or procedures" to accommodate disabled persons, §§12182(b)(2)(A)(ii), 12184(b)(2)(A), and to remove "architectural barriers, and communication barriers that are structural in nature" where such removal is "readily achievable," §§12182(b)(2)(A)(iv), 12184(b)(2)(C). Though holding Title III generally applicable, the District Court found that the petitioners' claims regarding physical barriers to access could not go forward because the federal agencies charged with promulgating ADA architectural and structural guidelines had not done so for cruise ships. The court therefore dismissed the barrier-removal claims, but denied NCL's motion to dismiss the petitioners' other claims. The Fifth Circuit held that Title III does not apply to foreign-flag cruise ships in U. S. waters because of a presumption, which the court derived from, *e.g., Benz* v. *Compania Naviera Hidalgo, S. A.,* 353 U. S. 138, and *McCulloch* v. *Sociedad Nacional de Marineros de Honduras,* 372 U. S. 10, that absent a clear indication of congressional intent, general statutes do not apply to foreign-flag ships. Emphasizing that Title III does not contain a specific provision mandating its application to such vessels, the court sustained the dismissal of the petitioners' barrier-removal claims and reversed on their remaining claims.

*Held:* The judgment is reversed, and the case is remanded.

356 F. 3d 641, reversed and remanded.

JUSTICE KENNEDY delivered an opinion concluding that except inso-far as Title III regulates a vessel's internal affairs, the statute is ap-plicable to foreign-flag cruise ships in U. S. waters. Parts II–A–1 and II–B–2 of that opinion held for the Court:

(a) Although Title III's "public accommodation" and "specified pub-lic transportation" definitions, §§12181(7)(A),(B)(I),(L), 12181(10), do not expressly mention cruise ships, there is no doubt that the NCL ships in question fall within both definitions under conventional principles of interpretation. The Fifth Circuit nevertheless held Title III inapplicable because the statute has no clear statement or explicit text mandating coverage for foreign-flag ships in U. S waters. This Court's cases, particularly *Benz* and *McCulloch*, do hold, in some cir-cumstances, that a general statute will not apply to certain aspects of the internal operations of foreign vessels temporarily in U. S. waters, absent a clear statement. The broad clear statement rule adopted by the Court of Appeals, however, would apply to every facet of the busi-ness and operations of foreign-flag ships. That formulation is inconsis-tent with the Court's case law and with sound principles of statutory in-terpretation. Pp. 5–6.

(b) Title III defines "readily achievable" barrier removal as that which is "easily accomplishable and able to be carried out without much difficulty or expense," §12181(9). The statute does not further define "difficulty," but the section's use of the disjunctive indicates that it extends to considerations in addition to cost. Furthermore, Ti-tle III directs that the "readily achievable" determination take into account "the impact . . . upon the [facility's] operation," §12181(9)(B). A Title III barrier-removal requirement that would bring a vessel into noncompliance with the International Convention for the Safety of Life at Sea or any other international legal obligation would create serious difficulties for the vessel and would have a substantial impact on its operation, and thus would not be "readily achievable." Con-gress could not have intended this result. It is logical and proper to conclude, moreover, that whether a barrier modification is "readily achievable" must take into consideration the modification's effect on shipboard safety. Title III's nondiscrimination and accommodation requirements do not apply if disabled individuals would pose "a sig-nificant risk to the health or safety of others that cannot be elimi-nated by a modification of policies, practices, or procedures." §12182(b)(3). It would be incongruous to attribute to Congress an in-tent to require modifications threatening others' safety simply be-cause the threat comes not from the disabled person but from the ac-commodation itself. Pp. 12–13.

JUSTICE KENNEDY, joined by JUSTICE STEVENS and JUSTICE SOUTER, concluded in Parts II–A–2, II–B–1, II–B–3, and III–B:

(a) As a matter of international comity, a clear statement of congressional intent is necessary before a general statutory requirement can interfere with matters that concern a foreign-flag vessel's internal affairs and operations. See, *e.g., Wildenhus's Case*, 120 U. S. 1, 12. In *Benz* and *McCulloch*, the Court held the National Labor Relations Act (NLRA) inapplicable to labor relations between a foreign vessel and its foreign crew not because foreign ships are generally exempt from the NLRA, but because that particular application of the NLRA would interfere with matters that concern only the ship's internal operations. These cases recognized a narrow rule, applicable only to statutory duties that implicate the foreign vessel's internal order rather than the welfare of American citizens. *E.g., McCulloch, supra*, at 21. In contrast, the Court later held the NLRA fully applicable to labor relations between a foreign vessel and American longshoremen because this relationship, unlike the one between a vessel and its own crew, does not implicate a foreign ship's internal order and discipline. *Longshoremen* v. *Ariadne Shipping Co.,* 397 U. S. 195, 198–201. This narrow clear statement rule is supported by sound principles of statutory construction. It is reasonable to presume Congress intends no interference with matters that are primarily of concern only to the ship and the foreign state in which it is registered. It is also reasonable, however, to presume Congress does intend its statutes to apply to entities in U. S. territory that serve, employ, or otherwise affect American citizens, or that affect the peace and tranquility of the United States, even if those entities happen to be foreign-flag ships. Cruise ships flying foreign flags of convenience but departing from and returning to U. S. ports accommodate and transport over 7 million U. S. residents annually, including large numbers of disabled individuals. To hold there is no Title III protection for the disabled would be a harsh and unexpected interpretation of a statute designed to provide broad protection for them. Pp. 6–9.

(b) Plainly, most of the Title III violations alleged below—that NCL required disabled passengers to pay higher fares and special surcharges; maintained evacuation programs and equipment in locations not accessible to them; required them, but not other passengers, to waive any potential medical liability and to travel with companions; reserved the right to remove them from ships if they endangered other passengers' comfort; and, more generally, failed to make reasonable modifications necessary to ensure their full enjoyment of the services offered—have nothing to do with a ship's internal affairs. However, the petitioners' allegations concerning physical barriers to access on board—*e.g.,* their assertion that most of NCL's cabins, in-

cluding the most attractive ones in the most desirable locations, are not accessible to disabled passengers—would appear to involve requirements that might be construed as relating to internal ship affairs. The clear statement rule would most likely come into play if Title III were read to require permanent and significant structural modifications to foreign vessels. Pp. 9–12.

(c) Because Title III does not require structural modifications that conflict with international legal obligations or pose any real threat to the safety of the crew or other passengers, it may well follow that Title III does not require any permanent and significant structural modifications that interfere with cruise ships' internal affairs. If so, recourse to the internal affairs clear statement rule would not be necessary. Cases may arise, however, where it is prudent for a court to invoke that rule without determining whether Title III actually imposes a particular barrier-removal requirement entailing a permanent and significant structural modification interfering with a foreign ship's internal affairs. Conversely, where it is not obvious that a particular physical modification relates to a vessel's basic architecture and construction, but it is clear the modification would conflict with an international legal obligation, the court may simply hold the modification not readily achievable, without resort to the clear statement rule. Pp. 13–14.

(d) The holding that the clear statement rule operates only when a ship's internal affairs are affected does not implicate the Court's holding in *Clark* v. *Martinez*, 543 U. S. ___, ___, that statutory language given a limiting construction in one context must be interpreted consistently in other contexts, "even though other of the statute's applications, standing alone, would not support the same limitation." *Martinez* applied a canon for choosing among plausible meanings of an ambiguous statute, not a clear statement rule that implies a special substantive limit on the application of an otherwise unambiguous statutory mandate. Pp. 16–18.

JUSTICE KENNEDY, joined by JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE THOMAS, concluded in Part III–A that if Title III imposed a requirement that interfered with a foreign-flag cruise ship's internal affairs, the clear statement rule would come into play, but that requirement would still apply to domestic ships, and Title III requirements having nothing to do with internal affairs would continue to apply to domestic and foreign ships alike. This application-by-application approach is consistent with how the clear statement rule has traditionally operated. If the rule restricts some NLRA applications to foreign ships (*e.g.*, labor relations with foreign crews in *Benz* and *McCulloch*), but not others (*e.g.*, labor relations with American longshoremen in *Ariadne Shipping*), it follows that its case-by-case

application is also required under Title III. The clear statement rule, if it is invoked, would restrict some applications of Title III to foreign ships (*e.g.*, certain structural barrier modification requirements), but not others (*e.g.*, the statute's prohibition on discriminatory ticket pricing). The rule is an implied limitation on a statute's otherwise unambiguous general terms. It operates much like other implied limitation rules, which avoid applications of otherwise unambiguous statutes that would intrude on sensitive domains in a way that Congress is unlikely to have intended had it considered the matter. See, *e.g., EEOC* v. *Arabian American Oil Co.,* 499 U. S. 244, 260. An all-or-nothing approach would convert the clear statement rule from a principle of interpretive caution into a trap for an unwary Congress, requiring nullification of the entire statute, or of some arbitrary set of applications larger than the domain the rule protects. Pp. 14–16.

JUSTICE GINSBURG, joined by JUSTICE BREYER, agreed that Title III of the Americans with Disabilities Act of 1990 covers cruise ships and allows them to resist modifications that would conflict with international legal obligations, but would give no wider berth to the "internal affairs" clear statement rule in determining Title III's application to respondent's ships. That rule derives from, and is moored to, the broader guide that statutes "should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." *Hartford Fire Ins. Co.* v. *California,* 509 U. S. 764, 815. This noninterference principle is served here by the Court's interpretation of 42 U. S. C. §12182(b)(2)(A)(iv)'s "readily achievable" language to avoid conflict with international legal obligations. The plurality's further suggestion that the "internal affairs" clear statement rule may block Title III-prompted structural modifications, even in the absence of conflict with international obligations, cuts the rule loose from its foundation. Because international relations are not at risk and the United States has a strong interest in protecting American passengers on foreign and domestic cruise ships, there is no reason to demand a clearer congressional statement that Title III reaches the vessels in question. Pp. 1–4.

JUSTICE THOMAS concluded that Title III of the of the Americans with Disabilities Act of 1990, insofar as it could be read to require structural changes, lacks a sufficiently clear statement that it applies to the internal affairs of foreign vessels. However, the clear statement rule does not render Title III entirely inapplicable to foreign vessels; instead, Title III applies to foreign ships only to the extent to which it does not bear on their internal affairs. Pp. 1–4.

KENNEDY, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A–1, and II–B–2, in

Syllabus

which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined, an opinion with respect to Parts II–A–2, II–B–1, II–B–3, and III–B, in which STE-VENS and SOUTER, JJ., joined, and an opinion with respect to Part III–A, in which STEVENS, SOUTER, and THOMAS, JJ., joined. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment, in which BREYER, J., joined. THOMAS, J., filed an opinion concurring in part, dissenting in part, and concurring in the judgment in part. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR, J., joined, and in which THOMAS, J., joined with respect to Part I–A.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 03–1388

## DOUGLAS SPECTOR, ET AL., PETITIONERS *v.* NORWEGIAN CRUISE LINE LTD.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 6, 2005]

JUSTICE KENNEDY announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A–1, and II–B–2, an opinion with respect to Parts II–A–2, II–B–1, II–B–3, and III–B, in which JUSTICE STEVENS and JUSTICE SOUTER join, and an opinion with respect to Part III–A, in which JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE THOMAS join.

This case presents the question whether Title III of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 353, 42 U. S. C. §12181 *et seq.*, applies to foreign-flag cruise ships in United States waters. The Court of Appeals for the Fifth Circuit held Title III did not apply because of a presumption, which it sought to derive from this Court's case law, that, absent a clear indication of congressional intent, general statutes do not apply to foreign-flag ships. 356 F. 3d 641, 644–646 (2004). The Court of Appeals for the Eleventh Circuit, on the other hand, has held that the ADA does apply to foreign-flag cruise ships in United States waters. See *Stevens* v. *Premier Cruises, Inc.*, 215 F. 3d 1237 (2000). We granted certiorari to resolve the conflict. 542 U. S. \_\_\_ (2004).

Our cases hold that a clear statement of congressional intent is necessary before a general statutory requirement can interfere with matters that concern a foreign-flag vessel's internal affairs and operations, as contrasted with statutory requirements that concern the security and well-being of United States citizens or territory. While the clear statement rule could limit Title III's application to foreign-flag cruise ships in some instances, when it requires removal of physical barriers, it would appear the rule is inapplicable to many other duties Title III might impose. We therefore reverse the decision of the Court of Appeals for the Fifth Circuit that the ADA is altogether inapplicable to foreign vessels; and we remand for further proceedings.

I

The respondent Norwegian Cruise Line Ltd. (NCL), a Bermuda Corporation with a principal place of business in Miami, Florida, operates cruise ships that depart from, and return to, ports in the United States. The ships are essentially floating resorts. They provide passengers with staterooms or cabins, food, and entertainment. The cruise ships stop at different ports of call where passengers may disembark. Most of the passengers on these cruises are United States residents; under the terms and conditions of the tickets, disputes between passengers and NCL are to be governed by United States law; and NCL relies upon extensive advertising in the United States to promote its cruises and increase its revenues.

Despite the fact that the cruises are operated by a company based in the United States, serve predominately United States residents, and are in most other respects United States-centered ventures, almost all of NCL's cruise ships are registered in other countries, flying so-called flags of convenience. The two NCL cruise ships that are the subject of the present litigation, the Norwegian

Sea and the Norwegian Star, are both registered in the Bahamas.

The petitioners are disabled individuals and their companions who purchased tickets in 1998 or 1999 for round-trip cruises on the Norwegian Sea or the Norwegian Star, with departures from Houston, Texas. Naming NCL as the defendant, the petitioners filed a class action in the United States District Court for the Southern District of Texas on behalf of all persons similarly situated. They sought declaratory and injunctive relief under Title III of the ADA, which prohibits discrimination on the basis of disability. The petitioners asserted that cruise ships are covered both by Title III's prohibition on discrimination in places of "public accommodation," §12182(a), and by its prohibition on discrimination in "specified public transportation services," §12184(a). Both provisions require covered entities to make "reasonable modifications in policies, practices, or procedures" to accommodate disabled individuals, §§12182(b)(2)(A)(ii), 12184(b)(2)(A), and require removal of "architectural barriers, and communication barriers that are structural in nature" where such removal is "readily achievable," §§12182(b)(2)(A)(iv), 12184(b)(2)(C).

The District Court held that, as a general matter, Title III applies to foreign-flag cruise ships in United States territorial waters. Civ. Action No. H–00–2649 (SD Tex., Sept. 10, 2002), App. to Pet. for Cert. 35a. The District Court found, however, that the petitioners' claims regarding physical barriers to access could not go forward because the agencies charged with promulgating architectural and structural guidelines for ADA compliance (the Architectural and Transportation Barriers Compliance Board, the Department of Transportation, and the Department of Justice) had not done so for cruise ships. In these circumstances, the court held, it is unclear what structural modifications NCL would need to make. *Id.*, at

36a–42a.  The District Court granted NCL's motion to dismiss the barrier-removal claims, but denied NCL's motion with respect to all the other claims.  *Id.*, at 47a.

The Court of Appeals for the Fifth Circuit affirmed in part and reversed in part.  It reasoned that our cases, particularly *Benz* v. *Compania Naviera Hidalgo, S. A.,* 353 U. S. 138 (1957), and *McCulloch* v. *Sociedad Nacional de Marineros de Honduras,* 372 U. S. 10 (1963), stand for the proposition that general statutes do not apply to foreign-flag vessels in United States territory absent a clear indication of congressional intent.  356 F. 3d, at 644 ("[T]o apply domestic law to foreign vessels entering United States waters, there must be present the affirmative intention of the Congress clearly expressed" (quoting *Benz*, *supra*, at 147 (internal quotation marks omitted)); 356 F. 3d, at 646 (*Benz* and *McCulloch* "prohibit United States courts from applying domestic statutes to foreign-flagged ships without specific evidence of congressional intent").  As Title III does not contain a specific provision mandating its application to foreign-flag vessels, the Court of Appeals sustained the District Court's dismissal of the petitioners' barrier-removal claims on this alternative ground and reversed the District Court on the remaining Title III claims.  356 F. 3d, at 650–651.

The action was ordered dismissed for failure to state a claim, Fed. Rule Civ. Proc. 12(b)(6), before extensive discovery.  We cannot then discuss the specific allegations in much detail but must confine our opinion to the relevant general principles.  (On November 24, 2004, the responsible agencies finally did issue draft guidelines for large passenger vessels and a Notice of Proposed Rulemaking.  See 69 Fed. Reg. 69244, 69249.  These developments are not dispositive of the legal question on which we granted certiorari, and we do not address how they might affect the ultimate resolution of the petitioners' claims.)

## II

### A

#### 1

Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U. S. C. §12182(a), and public transportation services, §12184(a). The general prohibitions are supplemented by various, more specific requirements. Entities that provide public accommodations or public transportation: (1) may not impose "eligibility criteria" that tend to screen out disabled individuals, §§12182(b)(2)(A)(i), 12184(b)(1); (2) must make "reasonable modifications in policies, practices, or procedures, when such modifications are necessary" to provide disabled individuals full and equal enjoyment, §§12182(b)(2)(A)(ii), 12184(b)(2)(A); (3) must provide auxiliary aids and services to disabled individuals, §§12182(b)(2)(A)(iii), 12184(b)(2)(B); and (4) must remove architectural and structural barriers, or if barrier removal is not readily achievable, must ensure equal access for the disabled through alternative methods, §§12182(b)(2)(A)(iv)–(v), 12184(b)(2)(C).

These specific requirements, in turn, are subject to important exceptions and limitations. Eligibility criteria that screen out disabled individuals are permitted when "necessary for the provision" of the services or facilities being offered, §§12182(b)(2)(A)(i), 12184(b)(1). Policies, practices, and procedures need not be modified, and auxiliary aids need not be provided, if doing so would "fundamentally alter" the services or accommodations being offered. §§12182(b)(2)(A)(ii)–(iii). Auxiliary aids are also unnecessary when they would "result in an undue burden," §12182(b)(2)(A)(iii). As we have noted, moreover, the barrier removal and alternative access requirements do not apply when these requirements are not "readily

achievable," §§12182(b)(2)(A)(iv)–(v). Additionally, Title III does not impose nondiscrimination or accommodation requirements if, as a result, disabled individuals would pose "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services," §12182(b)(3).

Although the statutory definitions of "public accommodation" and "specified public transportation" do not expressly mention cruise ships, there can be no serious doubt that the NCL cruise ships in question fall within both definitions under conventional principles of interpretation. §§12181(7)(A)–(B),(I),(L), 12181(10). The Court of Appeals for the Fifth Circuit, nevertheless, held that Title III does not apply to foreign-flag cruise ships in United States waters because the statute has no clear statement or explicit text mandating coverage for these ships. This Court's cases, particularly *Benz* and *McCulloch*, do hold, in some circumstances, that a general statute will not apply to certain aspects of the internal operations of foreign vessels temporarily in United States waters, absent a clear statement. The broad clear statement rule adopted by the Court of Appeals, however, would apply to every facet of the business and operations of foreign-flag ships. That formulation is inconsistent with the Court's case law and with sound principles of statutory interpretation.

2

This Court has long held that general statutes are presumed to apply to conduct that takes place aboard a foreign-flag vessel in United States territory if the interests of the United States or its citizens, rather than interests internal to the ship, are at stake. See *Cunard S. S. Co.* v. *Mellon,* 262 U. S. 100, 127 (1923) (holding that the general terms of the National Prohibition Act apply to foreign-flag ships in United States waters because "[t]here is in the act

no provision making it inapplicable" to such ships); *Uravic* v. *F. Jarka Co.,* 282 U. S. 234, 240 (1931) (holding that "general words" should be "generally applied" and that therefore there is "no reason for limiting the liability for torts committed [aboard foreign-flag ships in United States territory] when they go beyond the scope of discipline and private matters that do not interest the territorial power"). The general rule that United States statutes apply to foreign-flag ships in United States territory is subject only to a narrow exception. Absent a clear statement of congressional intent, general statutes may not apply to foreign-flag vessels insofar as they regulate matters that involve only the internal order and discipline of the vessel, rather than the peace of the port. This qualification derives from the understanding that, as a matter of international comity, "all matters of discipline and all things done on board which affec[t] only the vessel or those belonging to her, and [do] not involve the peace or dignity of the country, or the tranquility of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged." *Wildenhus's Case,* 120 U. S. 1, 12 (1887). This exception to the usual presumption, however, does not extend beyond matters of internal order and discipline. "[I]f crimes are committed on board [a foreign-flag vessel] of a character to disturb the peace and tranquility of the country to which the vessel has been brought, the offenders have never by comity or usage been entitled to any exemption from the operation of the local laws." *Ibid.*

The two cases in recent times in which the presumption against applying general statutes to foreign vessels' internal affairs has been invoked, *Benz* and *McCulloch*, concern labor relations. The Court held that the general terms of the National Labor Relations Act (NLRA), 49 Stat. 449, 29 U. S. C. §151 *et seq.*, did not govern the respective rights and duties of a foreign ship and its crew because the

NLRA standards would interfere with the foreign vessel's internal affairs in those circumstances. These cases recognized a narrow rule, applicable only to statutory duties that implicate the internal order of the foreign vessel rather than the welfare of American citizens. *McCulloch*, 372 U. S., at 21 (holding that "the law of the flag state ordinarily governs the *internal affairs* of a ship" (emphasis added)); see also *Benz*, 353 U. S., at 146–147. The Court held the NLRA inapplicable to labor relations between a foreign vessel and its foreign crew not because foreign ships are generally exempt from the NLRA, but because the particular application of the NLRA would interfere with matters that concern only the internal operations of the ship. In contrast, the Court held that the NLRA is fully applicable to labor relations between a foreign vessel and American longshoremen because this relationship, unlike the one between a vessel and its own crew, does not implicate a foreign ship's internal order and discipline. *Longshoremen* v. *Ariadne Shipping Co.,* 397 U. S. 195, 198–201 (1970).

This narrow clear statement rule is supported by sound principles of statutory construction. It is reasonable to presume Congress intends no interference with matters that are primarily of concern only to the ship and the foreign state in which it is registered. It is also reasonable, however, to presume Congress does intend its statutes to apply to entities in United States territory that serve, employ, or otherwise affect American citizens, or that affect the peace and tranquility of the United States, even if those entities happen to be foreign-flag ships.

Cruise ships flying foreign flags of convenience offer public accommodations and transportation services to over 7 million United States residents annually, departing from and returning to ports located in the United States. Large numbers of disabled individuals, many of whom have mobility impairments that make other kinds of vacation

travel difficult, take advantage of these cruises or would like to do so. To hold there is no Title III protection for disabled persons who seek to use the amenities of foreign cruise ships would be a harsh and unexpected interpretation of a statute designed to provide broad protection for the disabled. §12101. The clear statement rule adopted by the Court of Appeals for the Fifth Circuit, moreover, would imply that other general federal statutes— including, for example, Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U. S. C. §2000a *et seq.*—would not apply aboard foreign cruise ships in United States waters. A clear statement rule with this sweeping application is unlikely to reflect congressional intent.

The relevant category for which the Court demands a clear congressional statement, then, consists not of all applications of a statute to foreign-flag vessels but only those applications that would interfere with the foreign vessel's internal affairs. This proposition does not mean the clear statement rule is irrelevant to the ADA, however. If Title III by its terms does impose duties that interfere with a foreign-flag cruise ship's internal affairs, the lack of a clear congressional statement can mean that those specific applications of Title III are precluded. On remand, the Court of Appeals may need to consider which, if any, Title III requirements interfere with the internal affairs of foreign-flag vessels. As we will discuss further, however, Title III's own limitations and qualifications may make this inquiry unnecessary.

### B

#### 1

The precise content of the category "internal affairs" (or, as it is variously denoted in the case law, "internal order" or "internal operations") is difficult to define with precision. There is, moreover, some ambiguity in our cases as to whether the relevant category of activities is restricted

to matters that affect only the internal order of the ship when there is no effect on United States interests, or whether the clear statement rule further comes into play if the predominant effect of a statutory requirement is on a foreign ship's internal affairs but the requirement also promotes the welfare of United States residents or territory. We need not attempt to define the relevant protected category with precision. It suffices to observe that the guiding principles in determining whether the clear statement rule is triggered are the desire for international comity and the presumed lack of interest by the territorial sovereign in matters that bear no substantial relation to the peace and tranquility of the port.

It is plain that Title III might impose any number of duties on cruise ships that have nothing to do with a ship's internal affairs. The pleadings and briefs in this case illustrate, but do not exhaust, the ways a cruise ship might offend such a duty. The petitioners allege the respondent charged disabled passengers higher fares and required disabled passengers to pay special surcharges, Plaintiffs' First Amended Original Complaint in No. H–00–2649 (SD Tex.), ¶32, App. 15 (hereinafter Complaint); Brief for Petitioners 17–20; maintained evacuation programs and equipment in locations not accessible to disabled individuals, Complaint ¶19, App. 12; Brief for Petitioners 21; required disabled individuals, but not other passengers, to waive any potential medical liability and to travel with a companion, *id.*, at 8, 17–18; and reserved the right to remove from the ship any disabled individual whose presence endangers the "comfort" of other passengers, *id.*, at 8, 20. The petitioners also allege more generally that respondent "failed to make reasonable modifications in policies, practices, and procedures" necessary to ensure the petitioners' full enjoyment of the services respondent offered. Complaint ¶30, App. 15. These are bare allegations, and their truth is not conceded. We express

no opinion on the factual support for those claims. We can say, however, that none of these alleged Title III violations implicate any requirement that would interfere with the internal affairs and management of a vessel as our cases have employed that term.

At least one subset of the petitioners' allegations, however, would appear to involve requirements that might be construed as relating to the internal affairs of foreign-flag cruise ships. These allegations concern physical barriers to access on board. For example, according to the petitioners, most of the cabins on the respondent's cruise ships, including the most attractive cabins in the most desirable locations, are not accessible to disabled passengers. Brief for Petitioners 17–18; Complaint ¶16, App. 11. The petitioners also allege that the ships' coamings—the raised edges around their doors—make many areas of the ships inaccessible to mobility-impaired passengers who use wheelchairs or scooters. Brief for Petitioners 24. Removal of these and other access barriers, the petitioners suggest, may be required by Title III's structural barrier removal requirement, §§12182(b)(2)(A)(iv), 12184(b)(2)(C).

Although these physical barriers affect the passengers as well as the ship and its crew, the statutory requirement could mandate a permanent and significant alteration of a physical feature of the ship—that is, an element of basic ship design and construction. If so, these applications of the barrier removal requirement likely would interfere with the internal affairs of foreign ships. A permanent and significant modification to a ship's physical structure goes to fundamental issues of ship design and construction, and it might be impossible for a ship to comply with all the requirements different jurisdictions might impose. The clear statement rule would most likely come into play if Title III were read to require permanent and significant structural modifications to foreign vessels. It is quite a different question, however, whether Title III would re-

quire this. The Title III requirements that might impose permanent and substantial changes to a ship's architecture and design, are, like all of Title III's requirements, subject to the statute's own specific limitations and qualifications. These limitations may make resort to the clear statement rule unnecessary.

2

Title III requires barrier removal if it is "readily achievable," §12182(b)(2)(A)(iv). The statute defines that term as "easily accomplishable and able to be carried out without much difficulty or expense," §12181(9). Title III does not define "difficulty" in §12181(9), but use of the disjunctive—"easily accomplishable and able to be carried out without much difficulty or expense"—indicates that it extends to considerations in addition to cost. Furthermore, Title III directs that the "readily achievable" determination take into account "the impact . . . upon the operation of the facility," §12181(9)(B).

Surely a barrier removal requirement under Title III that would bring a vessel into noncompliance with the International Convention for the Safety of Life at Sea (SOLAS), Nov. 1, 1974, [1979–1980], 32 U. S. T. 47, T. I. A. S. No. 9700, or any other international legal obligation, would create serious difficulties for the vessel and would have a substantial impact on its operation, and thus would not be "readily achievable." This understanding of the statute, urged by the United States, is eminently reasonable. Brief as *Amicus Curiae* 27–28; ADA Title III Technical Assistance Manual III–1.2000(D) (Supp. 1994), available at http://www.usdoj.gov/crt/ada/taman3up.html (as visited May 31, 2005, and available in Clerk of Court's case file); 56 Fed. Reg. 45600 (1991). If, moreover, Title III's "readily achievable" exemption were not to take conflicts with international law into account, it would lead to the anomalous result that American cruise ships are obligated to comply with Title III even if doing so brings

them into noncompliance with SOLAS, whereas foreign ships—which unlike American ships have the benefit of the internal affairs clear statement rule—would not be so obligated. Congress could not have intended this result.

It is logical and proper to conclude, moreover, that whether a barrier modification is "readily achievable" under Title III must take into consideration the modification's effect on shipboard safety. A separate provision of Title III mandates that the statute's nondiscrimination and accommodation requirements do not apply if disabled individuals would pose "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services," §12182(b)(3). This reference is to a safety threat posed by a disabled individual, whereas here the question would be whether the structural modification itself may pose the safety threat. It would be incongruous, nevertheless, to attribute to Congress an intent to require modifications that threaten safety to others simply because the threat comes not from the disabled person but from the accommodation itself. The anomaly is avoided by concluding that a structural modification is not readily achievable within the meaning of §12181(9) if it would pose a direct threat to the health or safety of others.

3

Because Title III does not require structural modifications that would conflict with international legal obligations or pose any real threat to the safety of the crew or other passengers, it may well follow—though we do not decide the question here—that Title III does not require any permanent and significant structural modifications that interfere with the internal affairs of any cruise ship, foreign flag or domestic. If that is indeed the case, recourse to the clear statement rule would not be necessary.

Cases may arise, however, where it is prudent for a court to turn first to the internal affairs clear statement rule rather than deciding the precise scope and operation of the statute. Suppose, for example, it is a difficult question whether a particular Title III barrier removal requirement is readily achievable, but the requirement does entail a permanent and significant structural modification, interfering with a foreign ship's internal affairs. In that case a court sensibly could invoke the clear statement rule without determining whether Title III actually imposes the requirement. On the other hand, there may be many cases where it is not obvious that a particular physical modification relates to a vessel's basic architecture and construction, but it is clear the modification would conflict with SOLAS or some other international legal obligation. In those cases, a court may deem it appropriate to hold that the physical barrier modification in question is not readily achievable, without resort to the clear statement rule.

## III

### A

In light of the preceding analysis, it is likely that under a proper interpretation of "readily achievable" Title III would impose no requirements that interfere with the internal affairs of foreign-flag cruise ships. If Title III did impose a duty that required cruise ships to make permanent and significant structural modifications that did not conflict with international law or threaten safety, or if the statute otherwise interfered with a foreign ship's internal affairs, the clear statement rule recognized in *Benz* and *McCulloch* would come into play at that point. The Title III requirement in question, however, would still apply to domestic cruise ships, and Title III requirements having nothing to do with internal affairs would continue to apply to domestic and foreign ships alike.

This application-by-application use of the internal af-fairs clear statement rule is consistent with how the rule has traditionally operated. In *Benz* and *McCulloch*, the Court concluded that the NLRA did not apply to labor relations between a foreign-flag ship and its foreign crew because of interference with the foreign ships' internal affairs. In *Ariadne Shipping*, however, the Court held that the NLRA does apply to labor relations between a foreign-flag ship and American longshoremen. *Ariadne Shipping* acknowledged the clear statement rule invoked in *Benz* and *McCulloch* but held that the "considerations that informed the Court's construction of the statute in [those cases] are clearly inapplicable" to the question whether the statute applies to foreign ships' labor rela-tions with American longshoremen. 397 U. S., at 199. *Ariadne Shipping* held that the longshoremen's "short-term, irregular and casual connection with the [foreign] vessels plainly belied any involvement on their part with the ships' 'internal discipline and order.'" *Id.*, at 200. Therefore, application of the NLRA to foreign ships' rela-tions with American longshoremen "would have threat-ened no interference in the internal affairs of foreign-flag ships." *Ibid.* If the clear statement rule restricts some applications of the NLRA to foreign ships (*e.g.*, labor rela-tions with the foreign crew), but not others (*e.g.*, labor relations with American longshoremen), it follows that the case-by-case application is also required under Title III of the ADA. The rule, where it is even necessary to invoke it, would restrict some applications of Title III to foreign ships (*e.g.*, certain structural barrier modification re-quirements), but not others (*e.g.*, the prohibition on dis-criminatory ticket pricing).

The internal affairs clear statement rule is an implied limitation on otherwise unambiguous general terms of the statute. It operates much like the principle that general statutes are construed not to apply extraterritorially,

*EEOC* v. *Arabian American Oil Co.,* 499 U. S. 244, 260 (1991), or the rule that general statutes are presumed not to impose monetary liability on nonconsenting States, *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234 (1985). Implied limitation rules avoid applications of otherwise unambiguous statutes that would intrude on sensitive domains in a way that Congress is unlikely to have intended had it considered the matter. In these instances, the absence of a clear congressional statement is, in effect, equivalent to a statutory qualification saying, for example, "Notwithstanding any general language of this statute, this statute shall not apply extraterritorially"; or ". . . this statute shall not abrogate the sovereign immunity of nonconsenting States"; or ". . . this statute does not regulate the internal affairs of foreign-flag vessels." These clear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation. An all-or-nothing approach, under which a statute is altogether inapplicable if but one of its specific applications trenches on the domain protected by a clear statement rule, would convert the clear statement rule from a principle of interpretive caution into a trap for an unwary Congress. If Congress passes broad legislation that has some applications that implicate a clear statement rule—say, some extraterritorial applications, or some applications that would regulate foreign ships' internal affairs—an all-or-nothing approach would require that the entire statute, or some arbitrary set of applications larger than the domain protected by the clear statement rule, would be nullified. We decline to adopt that posture.

### B

Our holding that the clear statement rule operates only when a ship's internal affairs are affected does not implicate our holding in *Clark* v. *Martinez*, 543 U. S. ___ (2005).

*Martinez* held that statutory language given a limiting construction in one context must be interpreted consistently in other contexts, "even though other of the statute's applications, standing alone, would not support the same limitation." *Id.*, at ___ (slip op., at 8). This was simply a rule of consistent interpretation of the statutory words, with no bearing on the implementation of a clear statement rule addressed to particular statutory applications.

The statute in *Martinez*, 8 U. S. C. §1231(a)(6), authorized detention of aliens pending their removal. In *Zadvydas* v. *Davis,* 533 U. S. 678, 696–699 (2001), the Court had interpreted this statute to impose time limits on detention of aliens held for certain reasons stated in the statute. The Court held that an alternative interpretation, one allowing indefinite detention of lawfully admitted aliens, would raise grave constitutional doubts. Having determined the meaning of §1231(a)(6)'s text in *Zadvydas*, we were obliged in *Martinez* to follow the same interpretation even in a context where the constitutional concerns were not present. *Martinez*, 543 U. S., at ___ (slip op., at 5–9). As already made clear, the question was one of textual interpretation, not the scope of some implied exception. The constitutional avoidance canon simply informed the choice among plausible readings of §1231(a)(6)'s text: "The canon of constitutional avoidance," *Martinez* explained, "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them." *Id.*, at ___ (slip op., at 13) (emphasis deleted).

*Martinez* gives full respect to the distinction between rules for resolving textual ambiguity and implied limitations on otherwise unambiguous text. Indeed, *Martinez* relies on the distinction to reconcile its holding with two cases which did involve a clear statement rule, *Raygor* v.

*Regents of Univ. of Minn.,* 534 U. S. 533 (2002), and *Jinks* v. *Richland County,* 538 U. S. 456 (2003). *Raygor* had held that the tolling provision in the supplemental juris-diction statute, 28 U. S. C. §1367(d), does not apply to nonconsenting States because the statute lacks the re-quired clear statement that States are within its coverage. Later, in *Jinks*, we held that the §1367(d) tolling provision does apply to suits against counties. The counties were not protected by a clear statement rule analogous to the one applicable to States. See *Martinez*, 543 U. S., at ___ (slip op., at 11–12, and n. 6); see also *id.*, at ___ (slip op., at 6–8) (THOMAS, J., dissenting). "This progression of deci-sions," we held in *Martinez*, "does not remotely establish that §1367(d) has two different meanings, equivalent to the unlimited-detention/limited-detention meanings of §1231(a)(6) urged upon us here. They hold that the single and unchanging disposition of §1367(d) . . . does not apply to claims against States that have not consented to be sued in federal court." *Id.*, at ___ (slip op., at 12). The distinction between *Zadvydas* and *Martinez*, on the one hand, and *Raygor* and *Jinks*, on the other, is the distinc-tion between a canon for choosing among plausible mean-ings of an ambiguous statute and a clear statement rule that implies a special substantive limit on the application of an otherwise unambiguous mandate.

The internal affairs clear statement rule is an implied limitation rule, not a principle for resolving textual ambi-guity. Our cases, then, do not compel or permit the con-clusion that if any one application of Title III might inter-fere with a foreign-flag ship's internal affairs, Title III is inapplicable to foreign ships in every other instance.

\*    \*    \*

The Court of Appeals for the Fifth Circuit held that general statutes do not apply to foreign-flag ships in United States waters. This Court's cases, however, stand

only for the proposition that general statutes are presumed not to impose requirements that would interfere with the internal affairs of foreign-flag vessels. Except insofar as Title III regulates a vessel's internal affairs—a category that is not always well defined and that may require further judicial elaboration—the statute is applicable to foreign ships in United States waters to the same extent that it is applicable to American ships in those waters.

Title III's own limitations and qualifications prevent the statute from imposing requirements that would conflict with international obligations or threaten shipboard safety. These limitations and qualifications, though framed in general terms, employ a conventional vocabulary for instructing courts in the interpretation and application of the statute. If, on remand, it becomes clear that even after these limitations are taken into account Title III nonetheless imposes certain requirements that would interfere with the internal affairs of foreign ships—perhaps, for example, by requiring permanent and substantial structural modifications—the clear statement rule would come into play. It is also open to the court on remand to consider application of the clear statement rule at the outset if, as a prudential matter, that appears to be the more appropriate course.

We reverse the judgment of the Court of Appeals and remand the case for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 03–1388

DOUGLAS SPECTOR, ET AL., PETITIONERS *v.*
NORWEGIAN CRUISE LINE LTD.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 6, 2005]

JUSTICE GINSBURG, with whom JUSTICE BREYER joins,
concurring in part and concurring in the judgment.

I agree with the Court's holding that Title III of the
Americans with Disabilities Act of 1990 covers cruise
ships, *ante*, at 6, and allows them to resist modifications
"that would conflict with international legal obligations,"
*ante*, at 12–13. I therefore join Parts I, II–A–1, and II–B–
2 of the Court's opinion. I would give no wider berth,
however, to the "internal affairs" clear statement rule in
determining Title III's application to respondent's cruise
ships, the Norwegian Sea and Norwegian Star. But see
*ante,* at 14. That rule, as I understand it, derives from,
and is moored to, the broader guide that statutes "should
not be interpreted to regulate foreign persons or conduct if
that regulation would conflict with principles of interna-
tional law." *Hartford Fire Ins. Co.* v. *California,* 509 U. S.
764, 815 (1993) (SCALIA, J., dissenting); see also *id.,* at 816
(describing *McCulloch* v. *Sociedad Nacional de Marineros de
Honduras,* 372 U. S. 10 (1963), as applying this principle);
*Murray* v. *Schooner Charming Betsy,* 2 Cranch 64, 118
(1804). Title III is properly read to avoid such conflict, but

should not be hemmed in where there is no potential for international discord.[1]

The first of the modern cases to address the application of a domestic statute to a foreign-flag ship in U. S. waters, *Benz* v. *Compania Naviera Hidalgo, S. A.,* 353 U. S. 138 (1957), did not resort to the tag, "internal affairs" rule, to explain the Court's decision.[2] *Benz* held that the Labor Management Relations Act did not reach relations between "a foreign employer and a foreign crew operating under an agreement made abroad under the laws of another nation." *Id.,* at 142. As we concluded in *Benz,* before reading our law to "run interference in such a delicate field of international relations," "where the possibilities of international discord are so evident and retaliative action so certain," the Court should await Congress' clearly expressed instruction. *Id.,* at 147.

Six years later, in *McCulloch* v. *Sociedad Nacional de Marineros de Honduras,* 372 U. S. 10 (1963), the Court relied on *Benz* to hold that the National Labor Relations Act does not regulate the representation of alien seamen recruited in Honduras to serve aboard vessels under Honduran flags. Applying our law "to the internal management and affairs" of the vessels in question, we observed, *McCulloch,* 372 U. S., at 20, would produce a "head-on collision" with the regulatory regime installed under the Honduran labor code, *id.,* at 21. "[S]uch highly charged international circumstances," we said, called for adherence to the venerable interpretive guide that "'an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.'" *Ibid.* (quoting

_____

[1] Were a clear statement rule in order, I would agree with the plurality's application-by-application approach.

[2] Only in a footnote describing a National Labor Relations Board decision did the Court make a synonymous reference to the "internal economy of a vessel of foreign registry and ownership." *Benz,* 353 U. S., at 143, n. 5.

*Schooner Charming Betsy,* 2 Cranch, at 118). Cf. *Long-shoremen* v. *Ariadne Shipping Co.,* 397 U. S. 195, 200 (1970) (applying U. S. law to foreign ships' labor relations with longshoreworkers employed at U. S. ports is proper because doing so "would . . . threate[n] no interference in the internal affairs of foreign-flag ships likely to lead to conflict with foreign or international law").

The noninterference principle underlying the internal affairs clear statement rule is served in this case by the Court's interpretation of Title III's "readily achievable" provision, 42 U. S. C. §12182(b)(2)(A)(iv). See *ante*, at 12–13. Construing this language to allow ships to resist modifications "that would conflict with international legal obligations," *ante,* at 13, the Court ensures that Title III will not provoke "international discord" of the kind *Benz* and *McCulloch* sought to avoid. I agree with this interpretation, but would create no larger space for the internal affairs rule.

The plurality, however, suggests that the clear statement rule has a further office: It may block structural modifications prompted by Title III that are "readily achievable"—because they do not conflict with international legal obligations—but nonetheless "interfer[e] with a foreign ship's internal affairs." *Ante*, at 14. I disagree with this conception of the rule. In positing an extended application of the internal affairs rule, the plurality cuts the rule loose from its foundation. As *Benz* and *McCulloch* demonstrate, the clear statement rule is an interpretive principle counseling against construction of a statute in a manner productive of international discord. When international relations are not at risk, and there is good reason to apply our own law, asserted internal affairs of a ship should hold no greater sway than asserted management prerogatives of a landlocked enterprise.[3]

————

[3] One could hardly anticipate that, absent conflict with international

As the plurality rightly notes, Title III is a broad remedial statute designed to protect persons with disabilities in a variety of activities and settings. See *ante*, at 8–9; §12101(b). The United States has a strong interest in ensuring that U. S. resident cruise passengers enjoy Title III's protections on both domestic and foreign ships. See §12101; Brief for United States as *Amicus Curiae* 10.[4] Once conflicts with international legal obligations are avoided, I see no reason to demand a clearer congressional statement that Title III reaches the vessels in question, ships that regularly sail to and from U. S. ports and derive most of their income from U. S. passengers. In sum, I agree that §12182(b)(2)(A)(iv), properly read, does not require shipowners to make modifications that would conflict with international legal obligations. But I would attribute to the internal affairs clear statement rule no further limitation on Title III's governance in this case.

---

legal obligations, the application of Title III sought in this case would generate a "storm of diplomatic protest." *Id.*, at 146 (noting "storm of diplomatic protest" against proposal to apply U. S. law to prohibit advance payments by a foreign vessel to foreign seamen in foreign ports).

[4] As the Court notes, the ships at issue here "are operated by a company based in the United States, serve predominantly United States residents, and are in most other respects United States-centered ventures." *Ante*, at 2. Merchant ships sailing between U. S. and foreign ports would present a different question.

# SUPREME COURT OF THE UNITED STATES

No. 03–1388

DOUGLAS SPECTOR, ET AL., PETITIONERS *v.*
NORWEGIAN CRUISE LINE LTD.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 6, 2005]

JUSTICE THOMAS, concurring in part, dissenting in part, and concurring in the judgment in part.

When a law regulates the internal order of ships, Congress must clearly express its intent to apply the law to foreign-flag ships. *Ante*, at 6–8 (plurality opinion); *post,* at 1–2 (SCALIA, J., dissenting). I agree with JUSTICE SCALIA that this rule applies to any structural changes to a ship that Title III of the Americans with Disabilities Act of 1990 (ADA) might require, for such changes to a ship's physical structure pertain to its internal affairs. *Post,* at 2–4 (SCALIA, J., dissenting); see *ante*, at 11 (plurality opinion). I further agree with JUSTICE SCALIA that this clear statement rule applies once the possibility, rather than the certainty, of international discord arises; and that the clear statement rule therefore does not require or permit the kind of express conflicts-of-law analysis that the plurality demands. *Post*, at 4–6 (SCALIA, J., dissenting); *ante*, at 12–13 (majority opinion). Moreover, I do not think that courts should (as the plurality permits) employ the rule selectively, applying it when "prudent" but declining to apply it when "appropriate." *Ante,* at 13–14 (plurality opinion); see also *post*, at 10, n. 8 (SCALIA, J., dissenting); *Small* v. *United States*, 544 U. S. \_\_\_, (2005) (slip op., at 11) (THOMAS, J., dissenting) ("Whatever the utility of canons as guides to congressional intent, they are useless

when modified in ways that Congress could never have imagined"). For those reasons, I join part I–A of JUSTICE SCALIA's dissent. While I conclude that the rule applies to certain aspects of Title III, I agree with the plurality that it does not require an "all-or-nothing approach." *Ante*, at 16. Consequently, those applications of Title III that do not pertain to internal affairs apply to foreign-flag vessels. For that reason, I join part IIIA of the plurality opinion.

I reach this result, however, only because I continue to reject the "lowest common denominator" principle the Court articulated for the first time in *Clark* v. *Martinez*, 544 U. S. ___ (2005). See *id.*, at ___ (slip op., at 9–11) (THOMAS, J., dissenting). The Court, by contrast, accepts *Clark*. Moreover, it claims that applying Title III of the ADA to matters that are not within the realm of a ship's internal order is consistent with *Clark*. The plurality's efforts to distinguish *Clark* are implausible.

The plurality says that today's case differs from *Clark* because it invokes a clear statement rule to interpret unambiguous text. According to the plurality, *Clark* concerned the application of a previously adopted limiting construction of ambiguous text, which this Court imposed to ameliorate unrelated constitutional doubts. *Ante*, at 16–17. As an initial matter, however, the statute at issue in *Zadvydas* v. *Davis*, 533 U. S. 678 (2001) and *Clark* was not ambiguous. *Clark*, *supra*, at ___ (slip op., at 16–17) (THOMAS, J., dissenting). Even assuming for the sake of argument that it was ambiguous, the distinction the plurality draws has no basis in *Clark*. In *Clark*, this Court addressed the period of detention 8 U. S. C. §1231(a)(6) authorized for inadmissible aliens. This was a question left open by *Zadvydas*, *supra*, which had addressed the period of detention under the same statute but with respect to a different class of aliens—those who had been admitted into the country. In *Zadvydas*, this Court had

concluded that the possibility of indefinite detention of admitted aliens raised significant constitutional doubts and, in light of those doubts, it limited the Attorney General's power to detain admitted aliens. 533 U. S., at 689–690, 699. Section 1231(a)(6) does not distinguish between the two classes of aliens. Thus, this Court in *Clark* concluded it was compelled to apply that same construction, which was warranted only by the specific constitutional concerns arising for admitted aliens, to the unadmitted aliens before it. 543 U. S., at __ (slip op., at 8). *Clark*'s conclusion stemmed from the narrowing construction adopted in *Zadvydas*, not the type of rule or canon that gave rise to that construction. 543 U. S., at ___ (slip op., at 6–7).

The plurality's reasoning cannot be squared with *Clark*'s "lowest common denominator" principle. Under *Clark*, "[t]he lowest common denominator, as it were, must govern." *Id.,* at ___ (slip op., at 8). Just as in *Zadvydas* and *Clark*, this Court is called upon to interpret the same statutory text with respect to two different classes of cases—those that implicate the internal affairs of a vessel and those that do not. And just like the statute at issue in *Zadvydas* and *Clark*, Title III "applies without differentiation" to the internal and external affairs of foreign-flag vessels, as well as the internal and external affairs of domestic-flag ships. 543 U. S., at ___ (slip op., at 6). Thus, the limiting construction of Title III's definitions excluding foreign cruise ships from those definitions must govern *all* applications of the statute, not just those applications that pertain to internal affairs. According to *Clark*, the Court may not narrow Title III on a case-by-case basis, depending on whether a particular application of Title III interferes with a ship's internal order. In fact, it may not apply Title III to any ship or, for that matter, any entity at all, because Title III does not distinguish between any of the covered entities. This demonstrates

why the principle *Clark* established is flawed.

Today's decision, then, cabins the *Clark* principle to apply only when the canon of constitutional avoidance is invoked to choose among ambiguous readings of a statute. But even here *Clark* will continue to make mischief. As I explained in *Clark*, the lowest common denominator principle requires courts to search out a single hypothetical constitutionally doubtful case to limit a statute's terms in the wholly different case actually before the court, lest the court fail to adopt a reading of the statute that reflects the lowest common denominator. *Id.*, at ___ (slip op., at 14) (dissent). This requires a reverse-*Salerno* analysis that upends our facial challenge requirements. See *Clark*, *supra*, at ___ (slip op., at 10); see also *United States* v. *Salerno*, 481 U. S. 739, 745 (1987) (for a facial challenge to succeed, there must be no circumstance in which the statute is constitutional). For this and other reasons I have explained, the *Clark* analysis allows much havoc to be wrought from the canon of constitutional avoidance. See *Clark*, *supra*, at __ (slip op., at 10–15) (dissent).

In sum, I believe that Title III of the ADA, insofar as it requires structural changes, lacks a sufficiently clear statement that it applies to the internal affairs of foreign vessels. In my view the clear statement rule does not render Title III entirely inapplicable to foreign vessels; instead, Title III applies to foreign ships only to the extent to which it does not bear on their internal affairs. I therefore would remand for consideration of those Title III claims that do not pertain to the structure of the ship. Accordingly, I concur in part III A of the plurality opinion, join part I A of JUSTICE SCALIA's dissent, and concur in the judgment in part.

# SUPREME COURT OF THE UNITED STATES

———————

No. 03–1388

———————

## DOUGLAS SPECTOR, ET AL., PETITIONERS *v.* NORWEGIAN CRUISE LINE LTD.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 6, 2005]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, and with whom JUSTICE THOMAS joins as to Part I–A, dissenting.

I respectfully dissent. The plurality correctly recognizes that Congress must clearly express its intent to apply its laws to foreign-flag ships when those laws interfere with the ship's internal order. Its attempt to place Title III of the Americans with Disabilities Act of 1990 (ADA), outside this rule through creative statutory interpretation and piecemeal application of its provisions is unsupported by our case law. Title III plainly affects the internal order of foreign-flag cruise ships, subjecting them to the possibility of conflicting international obligations. I would hold that, since there is no clear statement of coverage, Title III does not apply to foreign-flag cruise ships.

## I

### A

As the plurality explains, where a law would interfere with the regulation of a ship's internal order, we require a clear statement that Congress intended such a result. See *ante*, at 6. This rule is predicated on the "rule of international law that the law of the flag ship ordinarily governs the internal affairs of a ship," *McCulloch* v. *Sociedad Na-*

*cional de Marineros de Honduras,* 372 U. S. 10, 21 (1963), and is designed to avoid "the possibilit[y] of international discord," *Benz* v. *Compania Naviera Hidalgo, S. A.,* 353 U. S. 138, 147 (1957); see also *McCulloch*, *supra,* at 19.

The clear-statement rule finds support not only in *Benz* and *McCulloch*, but in cases like *Cunard S. S. Co.* v. *Mellon,* 262 U. S. 100, 128–129 (1923), where we held that the National Prohibition Act, 41 Stat. 305, forbade foreign-flag ships from carrying or serving alcohol in United States territorial waters.  Though we did not say so expressly in that case, prohibiting the carrying and serving of alcohol in United States waters cannot be said to affect the "internal order" of the ship, because it does not in any way affect the operation or functioning of the craft.[1]  Similarly, in *Lauritzen* v. *Larsen,* 345 U. S. 571 (1953), and *Hellenic Lines Ltd.* v. *Rhoditis,* 398 U. S. 306 (1970), we did *not* employ a clear-statement rule in determining whether foreign seamen injured aboard foreign-flag ships could recover under the Jones Act, 41 Stat. 1007, 46 U. S. C. App. §688.  We distinguished these cases in *McCulloch*, explaining that a clear statement is not required "in different contexts, such as the Jones Act . . . where *the pervasive regulation of the internal order of a ship may not be present.*"  372 U. S., at 19, n. 9 (emphasis added).[2]

---

[1] The plurality also appears to have found that the National Prohibition Act contained a clear statement of intent to reach foreign-flag vessels, because the Act had been amended to state that it applied to "all territory subject to [the] jurisdiction" of the United States. *Cunard S. S. Co.* v. *Mellon*, 262 U. S. 100, 127 (1923) (internal quotation marks omitted).

[2] The plurality intimates that the clear-statement rule might be inapplicable in situations where, as here, the foreign-flag ships have a number of contacts with the United States. See *ante*, at 8. *McCulloch,* 372 U. S., at 19, expressly rejected this approach, explaining that any attempt to weigh the ship's contacts with the United States "would inevitably lead to embarrassment in foreign affairs and would be entirely infeasible in actual practice."

SCALIA, J., dissenting

As the plurality concedes, *ante*, at 10–11, the structural modifications that Title III of the ADA requires under its barrier-removal provisions, see 42 U. S. C. §§12182(b)(2)(A)(iv), 12184(b)(2)(C), would plainly affect the ship's "internal order." Rendering exterior cabins handicapped-accessible, changing the levels of coamings, and adding public restrooms—the types of modifications petitioners request—would require alteration of core physical aspects of the ship, some of which relate to safety. (Safety has, under international law, traditionally been the province of a ship's flag state.) This is quite different from prohibiting alcohol in United States waters or imposing tort liability for injuries sustained on foreign ships in port—the laws at issue in *Cunard* and the Jones Act cases. Those restrictions affected the ship only in limited circumstances, and in ways ancillary to its operation at sea. A ship's design and construction, by contrast, are at least as integral to the ship's operation and functioning as the bargaining relationship between shipowner and crew at issue in *Benz* and *McCulloch*.

Moreover, the structural changes petitioners request would be permanent. Whereas a ship precluded from serving or carrying alcohol in United States waters may certainly carry and serve alcohol on its next trip from Italy to Greece, structural modifications made to comply with American laws cannot readily be removed once the ship leaves our waters and ceases to carry American passengers. This is again much like the situation presented in *Benz* and *McCulloch*, where the application of American labor laws would have continued to govern contracts between foreign shipowners and their foreign crews well beyond their time in our waters.

The purpose of the "internal order" clear-statement requirement is to avoid casually subjecting oceangoing vessels to laws that pose obvious risks of conflict with the laws of the ship's flag state, the laws of other nations, and

international obligations to which the vessels are subject. That structural modifications required under Title III qualify as matters of "internal order" is confirmed by the fact that they may already conflict with the International Convention for the Safety of Life at Sea (SOLAS), Nov. 1, 1974, [1979–1980] 32 U. S. T. 47, T. I. A. S. No. 9700. That treaty, which establishes the safety standards governing the design and maintenance of oceangoing ships, has been ratified by 155 countries. See International Maritime Organization, Summary of Status of Conventions, http://www.imo.org/Conventions/mainframe.asp?topic_id= 247 (all Internet materials as visited June 2, 2005, and available in Clerk of Court's case file). The ADA Accessibility Guidelines (ADAAG) Review Advisory Committee— the Government body Congress has charged with formulating the Title III barrier-removal guidelines—has promulgated rules requiring at least one accessible means of egress to be an elevator, whereas SOLAS, which requires at least two means of escape, does not allow elevators to be one of them. See Passenger Vessel Access Advisory Committee, Final Report: Recommendations for Accessibility Guidelines for Passenger Vehicles, ch. 13, pt. I (Dec. 2000), http://www.access-board.gov/news/pvaac-rept.htm (hereinafter PVAAC Report) (explaining potential conflicts between ADAAG regulations and SOLAS). The ADAAG rules set coaming heights for doors required to be accessible at one-half inch; SOLAS sets coaming heights for some exterior doors at three to six inches to ensure that those doors will be watertight. *Ibid.*

Similar inconsistencies may exist between Title III's structural requirements and the disability laws of other countries. The United Kingdom, for example, is considering the promulgation of rules to govern handicapped accessibility to passenger vehicles, including cruise ships. The rules being considered currently include exact specifi-

cations, down to the centimeter, for the height of hand-rails, beds and electrical switches, and the width of door openings. See Disabled Persons Transport Advisory Committee, The design of large passenger ships and passenger infrastructure: Guidance on meeting the needs of disabled people (Nov. 2000), http://www.dptac.gov.uk/pubs/guideship/pdf/dptacbroch.pdf. Though many of these regulations may be compatible with Title III, it is easy to imagine conflicts arising, given the detailed nature of ADAAG's regulations. See PVAAC Report, chs. 1–11. As we have previously noted, even this "*possibility* of international discord" with regard to a seagoing vessel's internal order, *McCulloch*, 372 U. S., at 21 (emphasis added), gives rise to the presumption of noncoverage absent clear statement to the contrary.

The Court asserts that Title III would not produce conflicts with the requirements of SOLAS and would not compromise safety concerns. This argument comes at the expense of an expansive *en passant* interpretation of the exceptions to the barrier-removal requirements of Title III—which interpretation will likely have more significant nationwide effects than the Court's holding concerning Title III's application to foreign-flag vessels. Assuming, however, that the argument is even correct,[3] it is entirely beside the point. It has never been a condition for application of the foreign-flag clear-statement rule that an actual conflict with foreign or international law be established—

---

[3] This is by no means clear. Title III defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." §12181(9). It is, at best, ambiguous whether a barrier removal can be rendered not "easily *accomplishable*" or not "able to be *carried out* without much difficulty" by factors extrinsic to the removal itself. Conflict of an easily altered structure with foreign laws seems to me not much different from the tendency of an easily altered structure to deter customers. That is why, as suggested in text, the Court's unexpected Title III holding may be the most significant aspect of today's foreign-flag decision.

any more than that has been a condition for application of the clear-statement rule regarding extraterritorial effect of congressional enactments. The reason to apply the rule here is that the structure of a ship pertains to the ship's internal order, which is a matter presumably left to the flag state unless Congress indicates otherwise. The basis for that presumption of congressional intent is principally (though perhaps not exclusively) that subjecting such matters to the commands of various jurisdictions raises the *possibility* (not necessarily the certainty) of conflict among jurisdictions and with international treaties. Even if the Court could, by an imaginative interpretation of Title III, demonstrate that in this particular instance there would be no conflict with the laws of other nations or with international treaties,[4] it would remain true that a ship's structure is preeminently part of its internal order; and it would remain true that subjecting ship structure to multiple national requirements invites conflict. *That* is what triggers application of the clear-statement rule.

Safety concerns—and specifically safety as related to ship structure—are traditionally the responsibility of the flag state. Which is to say they are regarded as part of the ship's internal order. And even if Title III makes ample provision for a safety exception to the barrier-removal requirements, what *it* considers necessary for safety is not necessarily what other nations or international treaties consider necessary.

The foregoing renders quite unnecessary the Court's worry that Title III might require American cruise ships to adhere to Congress's prescription in violation of SOLAS. See *ante*, at 12. If and when that possibility presents

---

[4] The Court, of course, has not even shown that Title III is consistent with the laws of the cruise ships' flag state; much less has it undertaken the Herculean task—which its theory of presumed coverage by domestic law would require—of showing Title III consistent with the laws of all the cruise ships' ports of call.

itself, the Court remains free to do what it does here: to interpret Title III so as to avoid any conflict. But the availability of such an interpretation has no bearing upon whether the structural features of an oceangoing vessel are part of its internal order. (I must observe, however, that it seems much more plausible that Congress intended to require American cruise ships to adhere to Title III regardless of SOLAS, than that—what the Court apparently believes—Congress intended Title III to be interpreted with an eye to SOLAS.) In any event, the application of Title III to oceangoing vessels under American flag is not at issue here. I would therefore hold that, because Title III's barrier-removal provisions clearly have the possibility of subjecting foreign-flag ships to conflicting international obligations, no reading of Title III—no matter how creative—can alter the presumption that Title III does not apply to foreign-flag ships without a clear statement from Congress.[5]

### B

The plurality holds that, even "[i]f Title III did impose a duty that required [foreign-flag] cruise ships to make permanent and significant structural modifications[,] or . . . otherwise interfered with a foreign ship's internal affairs . . . Title III requirements having nothing to do with internal affairs would continue to apply to domestic and foreign ships alike." *Ante*, at 14. I disagree. Whether or not Title III's prescriptions regarding such matters implicate the "internal order" of the ship, they still relate to the ships' maritime operations and are part of the same Title III.[6]

---

[5] Of course this clear-statement rule would not apply to the onshore operations of foreign cruise companies, which would be treated no differently from the operations of other foreign companies on American soil.

[6] This includes the pricing and ticketing policies, which are intimately related to the ships' maritime operations (and perhaps to internal

The requirements of that enactment either apply to for-eign-flag ships or they do not.  It is not within our power to design a statute some of whose provisions apply to foreign-flag ships and other of whose provisions do not—any more than it is within our power to prescribe that the statute applies to foreign-flag cruise ships 60% of whose passengers are United States citizens and does not apply to other foreign-flag cruise ships.

The plurality's assertion that those portions of Title III that do *not* implicate a ship's internal order apply to for-eign-flag ships displays a confusion between a principle of interpretation based upon a true-to-fact presumption of congressional intent, and a court-made rule.  The plurality seems to forget that it is a matter of determining whether Congress *in fact intended* that its enactment cover foreign-flag ships.  To believe that there was any such intent section-by-section and paragraph-by-paragraph is delusional.  Either Congress enacted Title III only with domes-tic entities (and not foreign-flag ships) in mind, or it in-tended Title III to apply across-the-board.  It could not possibly be the real congressional intent that foreign-flag cruise ships be considered "place[s] of public accommoda-tion" or "specified public transportation" for purposes of certain provisions but not for others.  That Congress had separate foreign-flag intent with respect to each require-ment—and would presumably adopt a clear statement provision-by-provision—is utterly implausible.  And far from its being the case that this creates "a trap for an unwary Congress," *ante,* at 16, it is the plurality's disposi-tion that, in piecemeal fashion, applies to foreign-flag ships provisions never enacted with foreign-flag vessels in

order) because they are designed to defray the added cost and provide the added protection that the cruise-ship companies deem necessary for safe transport of disabled passengers.

mind.[7] We recently addressed a similar question in *Clark* v. *Martinez*, 543 U. S. ___ (2005), where we explained that a statutory provision must be interpreted consistently from case to case. "It is not at all unusual to give a statut[e] . . . a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation." *Id.,* at ___ (slip op., at 8). That principle should apply here. Since some applications of Title III plainly affect the internal order of foreign-flag ships, the absence of a clear statement renders the statute inapplicable—even though some applications of the statute, if severed from the rest, would not require clear statement.

This does not mean that a clear statement is required whenever a court applies Title III to any entity—only that a clear statement is required to apply any part of Title III *to foreign-flag ships*. *Raygor* v. *Regents of Univ. of Minn.*, 534 U. S. 533 (2002), and *Jinks* v. *Richland County*, 538 U. S. 456 (2003), do not dictate otherwise. *Raygor* held that 28 U. S. C. §1367(d) does not include, in its tolling of the limitations period, claims against States, because it contains no clear statement that States are covered. *Jinks* held that §1367(d)'s tolling provision does apply to claims against political subdivisions of States, because no clear-

_____

[7] The plurality's discussion of *Longshoremen* v. *Ariadne Shipping Co.*, 397 U. S. 195 (1970), is misleading. Although *Ariadne* clearly recognized the existence of an internal-order rule in our case law, see *id.*, at 200, *Ariadne* did not hold, similarly to what the plurality holds here, that application of the foreign-flag clear-statement rule prevented some provisions of the National Labor Relations Act (NLRA) from being applied to foreign-flag ships but allowed others to be applied. Rather, it held that the clear-statement rule *did not apply at all* to activities that were not "within the 'maritime operations of foreign-flag ships.'" *Ibid.* The case is relevant only to questions the Court does not decide here— namely, application of Title III to onshore operations of the foreign-flag ships. It is *not* relevant to the question whether *all* maritime activities are exempt from Title III for lack of a clear statement.

statement requirement applies to those entities. In other words, a clear statement is required to apply §1367(d) to States, just as a clear statement is required to apply Title III to foreign-flag ships. A clear statement is *not* required to apply §1367(d) to political subdivisions of States, just as a clear statement is *not* required to apply Title III to domestic ships or other domestic entities. The question in each of these cases is whether *the statute* at issue covers certain entities, not whether some *provisions* of a statute cover a given entity.

The fine-tuning of legislation that the plurality requires would be better left to Congress. To attempt it through the process of case-by-case adjudication is a recipe for endless litigation and confusion. The plurality's resolution of today's case proves the point. It requires this Title III claimant (and every other one who brings a claim against a foreign shipowner) to show that each particular remedy he seeks does not implicate the internal order of the ship. That showing, where structural modification is involved, would not only require the district court to determine what is "readily achievable," *ante*, at 12–14, and what would "pose 'a significant risk to the health or safety of others,'" *ante*, at 13 (quoting §12182(b)(3)), but would also require it to determine the obligations imposed by foreign law and international treaties.[8]  All this to establish the

-----

[8] The plurality attempts to simplify this inquiry by explaining that, if it is "a difficult question whether a particular Title III barrier removal requirement is readily achievable, but the requirement does entail a permanent and significant structural modification, interfering with a foreign ship's internal affairs[,] a court sensibly could invoke the clear statement rule without determining whether Title III actually imposes the requirement." *Ante*, at 14. It is impossible to reconcile this with the plurality's rationale, which excludes the clear-statement rule when there is no actual conflict with foreign law. On the plurality's own analysis, significant structural modifications are *least likely* to pose an actual conflict with foreign law, since they are *most likely* to be regarded as (under the plurality's new Title III jurisprudence) not "read-

preliminary point that Title III applies and the claim can proceed to adjudication. If Congress desires to impose this time-consuming and intricate process, it is certainly able to do so—though I think it would likely prefer some more manageable solution.[9] But for the plurality to impose it as a novel consequence of the venerable clear-statement rule seems to me unreasonable. I would therefore decline to apply all of Title III to foreign-flag ships without a clear statement from Congress.

## II

As the Court appears to concede, neither the "public accommodation" provision nor the "specified public transportation" provision of Title III clearly covers foreign-flag cruise ships. The former prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U. S. C. §12182(a). Though Congress gave a seemingly exhaustive list of entities constituting "public accommodation[s]"—including inns, hotels, restaurants, theaters, banks, zoos, and laundromats—it failed to mention ships, much less foreign-flag

---

ily achievable" and hence not required. I am at a loss to understand what the plurality has in mind.

[9] After this Court concluded, in *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 260 (1991), *(ARAMCO),* that Title VII of the Civil Rights Act of 1964, does not protect American citizens working for American employers in foreign countries, Congress amended Title VII. Unlike what would have been this Court's only available resolution of the issue had it come to the opposite conclusion in *ARAMCO*—that Title VII applies to all American employers operating abroad—Congress was able to craft a more nuanced solution by exempting employers if compliance with Title VII would run afoul of the law in the country where the workplace was located. See 42 U. S. C. §2000e–1(b); cf. §12112(c)(1) (same disposition for Title I of the ADA).

ships. See §12181(7). Particularly where Congress has provided such detailed specification, this is not a clear statement that foreign-flag ships are covered. Petitioners also claim that, because cruise ships are essentially float-ing hotels that contain restaurants and other facilities explicitly named in §12181(7), they should be covered. While this may support the argument that *cruise ships* are "public accommodations," it does not support the position that Congress intended to reach *foreign-flag* cruise ships.

The "specified public transportation" provision prohibits discrimination on the basis of disability "in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." §12184(a). The definition of "specified public transportation" includes "transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." §12181(10). "[A]ny other conveyance" clearly covers ships. But even if the statute specifically *men-tioned* ships, that would not be a clear statement that *foreign-flag* ships are included—any more than the refer-ence to "employer" in the NLRA constituted a clear state-ment that foreign-flag ship employers were covered, see *McCulloch,* 372 U. S., at 19–21.

Title III of the ADA stands in contrast to other statutes in which Congress *has* made clear its intent to extend its laws to foreign ships. For example, the Maritime Drug Law Enforcement Act, 94 Stat. 1159, 46 U. S. C. App. §1901 *et seq.*, which permits the inspection and apprehen-sion of vessels suspected of possessing controlled sub-stances, applies to "vessel[s] subject to the jurisdiction of the United States," §1903(a), which includes vessels "lo-cated within the customs waters of the United States," §1903(c)(1)(D), and "vessels registered in a foreign nation

where the flag nation has consented or waived objection" to United States jurisdiction, §1903(c)(1)(C). Section 5 of the Johnson Act, 64 Stat. 1135, as amended, 106 Stat. 61, 15 U. S. C. §1175(a), restricts the use of gambling devices "on a vessel . . . documented under the laws of a foreign country." See also 14 U. S. C. §89(a) (Coast Guard may engage in searches on "waters over which the United States has jurisdiction" of "any vessel subject to the jurisdiction, or to the operation of any law, of the United States"); 18 U. S. C. §2274 (making it unlawful for "the owner, master or person in charge or command of any private vessel, foreign or domestic . . . within the territorial waters of the United States" willfully to cause or permit the destruction or injury of their vessel in certain circumstances).

That the Department of Justice and the Department of Transportation—the Executive agencies charged with enforcing the ADA—appear to have concluded that Congress intended Title III to apply to foreign-flag cruise ships does not change my view. We "accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ." *ARAMCO,* 499 U. S. 244, 260 (1991) (SCALIA, J., concurring in part and concurring in judgment) (declining to adopt the Equal Employment Opportunity Commission's determination that Title VII applied to employers abroad); see also *id.,* at 257–258 (opinion of the Court) (same). In light of our longstanding clear-statement rule, it is not reasonable to apply Title III here.

I would therefore affirm the Fifth Circuit's judgment that Title III of the ADA does not apply to foreign-flag cruise ships in United States territorial waters.